# UNITED STATES DISTRICT COURT

**SEALED**

for the

Eastern District of California

**FILED**

Apr 15, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Corey Scott Harris | ) Case No. 1:24-mj-00046-SKO |
| | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT BY RELIABLE ELECTRONIC OR TELEPHONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __January 1, 2021 to August 13, 2023__ in the county of __Tulare__ in the
__Eastern__ District of __District__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 933(a)(3) | Conspiracy to Traffic Firearms<br>    Maximum Penalty: 15 years' imprisonment, $250,000 fine, 3 years supervised release, $100 special assessment |
| 18 U.S.C. 922(a)(1)(A) | Dealing and Manufacturing Firearms Without A License<br>    Maximum Penalty: 15 years' imprisonment, $250,000 fine, 3 years supervised release, $100 special assessment |

This criminal complaint is based on these facts:

See attached affidavit of SA Christopher Stantzos.

☑ Continued on the attached sheet.

_Chris Stantzos_
_Complainant's signature_

Christopher Stantzos, ATF S.A.
_Printed name and title_

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P.
4.1 by telephone

Date: __April 15, 2024__

_Sheila K. Oberto_
_Judge's signature_

City and state: __Fresno, CA__          Hon. Sheila K. Oberto, U.S. Magistrate Judge
_Printed name and title_

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| Plaintiff, | AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER STANTZOS |
| v. | |
| COREY SCOTT HARRIS, | |
| Defendant. | |

I, Christopher Stantzos, being sworn, depose and state the following:

## I.      INTRODUCTION

1.      This affidavit is in support of a complaint and arrest warrant for Corey Scott **HARRIS** with violations of Title 18, United States Code, Section 922(a)(1)(A), engaging in the business of dealing in firearms without a license and Title 18 United States Code, Section 933(a)(3), conspiracy to commit firearms trafficking.  These crimes took place between January 1, 2021, and August 13, 2023. The information set forth in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all the information known to me and other law enforcement investigators. Rather, this affidavit serves only to establish probable cause for the arrest of **HARRIS**.

## II.      AFFIANT'S BACKGROUND

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since March 2020.  I attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting firearms, explosives, arson, firearms trafficking, and gang investigations.  Before joining the ATF, I was an Intelligence Analyst for the Federal Bureau of Investigation ("FBI") for approximately four and a half years.  As an Intelligence Analyst, I produced intelligence products in furtherance of civil rights crimes investigations and complex international money laundering investigations.  Before joining the FBI, I was a forensic scientist for the Washington, DC Department of

Forensic Sciences, where I identified, documented, preserved, and collected physical evidence from crime scenes for nearly two years.

3.      As an ATF agent, I have debriefed multiple informants, witnesses, and subjects who had personal knowledge regarding illegal firearms and drug trafficking.  Additionally, I have participated in many aspects of gang, firearms trafficking, and drug trafficking investigations, including undercover operations, arrests, physical and digital device search warrants, physical and electronic surveillance, GPS tracker installations, and the analysis of telephone call detail records.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of firearm-trafficking and drug-trafficking, and money-laundering methods used to conceal the nature of the proceeds.  I have conducted and participated in several investigations involving the illegal manufacture and sale of firearms.  I have assisted in the execution of several search warrants for investigations related to the illegal manufacture and sale of firearms and the sale of drugs.  I am familiar with the methods employed by individuals involved in firearms and drug trafficking to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

### III.      APPLICABLE LAW

4.      Title 18, United States Code, Section 922(a)(1)(A) prohibits any person, except a licensed dealer, to engage in the business of dealing in firearms.

5.      Title 18, United States Code, Section 933(a)(3) prohibits any person from attempting or conspiring to ship, transport, transfer, cause to be transported or otherwise dispose of any firearm to another person in or otherwise affecting interstate or foreign commerce, if such person knows or has reasonable cause to believe that the use, carrying, or possession of a firearm by the recipient would constitute a felony OR receive from another person any firearm in or otherwise affecting interstate or foreign commerce, if the recipient knows or has reasonable cause to believe that such receipt would constitute a felony.

### IV.    OVERVIEW

6.      While conducting an investigation into a firearms trafficking ring in the Central District of California, ATF agents learned that one of the defendants in that ring, Defendant 2, was purchasing firearms from Corey **HARRIS**, a sworn law enforcement officer in the Eastern District of California. Through search warrants of Defendant 2's residence and a forensic download of Defendant 2's phone, I learned that **HARRIS** knew that Defendant 2 was a felon and sold him firearms, including machineguns, on multiple occasions in the Eastern District of California. **HARRIS** does not possess a federal firearms license.

### V.    SUMMARY OF PROBABLE CAUSE

7.      In or around October 2022, ATF began investigating Defendant 1[1] for unlicensed firearms dealing and drug trafficking in Santa Barbara County, within the Central District of California.  In late October 2022, an ATF confidential informant (the "CI") identified Defendant 1 as a source of drugs and firearms.[2]  On or about October 27, 2022, the CI purchased a privately manufactured, AR-style, .223 caliber machinegun from Defendant 1, which I later determined was purchased by Defendant 1 from Defendant 2, who was prohibited from possessing firearms, and who had purchased it from **HARRIS** in the Eastern District of California.

8.      Since then, the CI and/or an ATF undercover Special Agent ("UC") conducted approximately twelve controlled purchases of firearms from Defendant 1 and co-conspirators Defendant 2, Defendant 3, and Defendant 4, and four controlled purchases of methamphetamine from Defendant 1 and an unindicted co-conspirator.  Over the course of these transactions, ATF purchased 28 firearms from the Defendants, and approximately 10 pounds of methamphetamine from Defendant 1 and the unindicted co-conspirator.

9.      In August 2023, ATF and its state and local law enforcement partners served search and

---

[1] Defendant 1, along with Defendant 2, Defendant 3, and Defendant 4, has been charged in a criminal case in the Central District of California for violating federal firearms and drug trafficking statutes.

[2] The CI has been compensated approximately $4,200 thus far for his/her assistance in this investigation by the ATF.  The CI has a pending criminal case in the Central District of California for firearms and drug trafficking violations and has signed a cooperation agreement with the USAO.  The CI has been active for approximately one year and nine months and has consistently provided credible and reliable information.

arrest warrants for Defendants 1-4 in Santa Barbara County.[3]  During the service of these warrants, ATF recovered Defendant 2's cell phone and subsequently searched it per the terms of the warrants.  During the search, I discovered text messages dated between 2021 and mid-2023 between Defendant 2 and the user of phone number (559) 805-6896 (listed as "Corey" in Defendant 2's phone contacts) regarding the possession, use, and sale of firearms, ammunition, and firearms parts and accessories.  Defendant 2 was prohibited from possessing firearms and ammunition based on his criminal history.  Based on my analysis of the text messages between Defendant 2 and "Corey," a search of commercial databases, and my review of subscriber information for Verizon phone number (559) 805-6896, I determined the user of (559) 805-6896 to be **COREY HARRIS**, a law enforcement officer in Tulare County in the Eastern District of California.  Furthermore, it appeared to me that **HARRIS** had been selling Defendant 2 firearms, ammunition, extended magazines, other firearms accessories, and instructing Defendant 2 on how to manufacture firearms since at least January 2021.

10.     During this same search of Defendant 2's phone, I located images of firearms magazines and parts and accessories that appeared to be screenshots of Instagram "stories" belonging to the Instagram account "Lion.tactical," an account I believe to have been used by **HARRIS**.[4]  I later learned that **HARRIS** changed this Instagram account to be named "Beaker.jones."[5]

11.     The messages in Defendant 2's phone indicated a pattern of firearms trafficking between **HARRIS** and Defendant 2 between January 2021 and August 2023, including specifically the transfer of a Glock 17C pistol in March/April of 2021, a privately-manufactured AR-style machinegun in Spring of 2021, and an AK-style firearm in August of 2022. **HARRIS** and Defendant 2 continued to discuss other firearms transactions until Defendant 2 was arrested in August 2023, with the most recent messages

---

[3] The Honorable Jacqueline Chooljian, U.S. Magistrate Judge for the Central District of California, authorized the warrants, on August 11, 2023.

[4] At the time of the search of Defendant 2's phone, the Instagram account "lion.tactical" was active.  I know this because ATF SA Jannah Holden used an undercover Instagram account to view the "lion.tactical" account. SA Holden informed me a short while later that she successfully "followed" the account.

[5] I viewed the Instagram account "Beaker.jones" in January 2024 and saw the tagline on the profile page: "(Previously Lion Tactical) Knife Collector Precious Metal Stacker Pew Pew Lover."  As of February 6, 2024, the tagline had been altered to read: "Knife Raffles."

COMPLAINT AFFIDAVIT
4

occurring two days before Defendant 2's arrest.

12.     In January of 2024, agents confirmed that **HARRIS'** "Beaker.jones" Instagram account was still active and still displayed posts consistent with firearms trafficking.

13.     I confirmed through ATF databases that **HARRIS** does not possess a Federal Firearms License and hase not registered the transfer of any machineguns as required by law in the National Firearms Registration and Transfer Record.

14.     Based on the information contained in this affidavit, I believe that **HARRIS** is in violation of the following federal statutes:

a)     Conspiracy to commit firearms trafficking in violation of 18 U.S.C. § 933(a)(3), in that he conspired with Defendant 2 to transfer firearms to another person with reasonable cause that possession of said firearm would be a felony. **HARRIS** transferred firearms to Defendant 2, a felon, under circumstances where it was clear Defendant 2 could not possess firearms, and also transferred a machinegun to Defendant 2 in violation of the laws governing the transfer of machineguns. As a sworn peace officer, **HARRIS** should reasonably know that possession of firearms under those circumstances is a felony.

b)     Unlawful dealing and manufacturing of firearms in violation of 18 U.S.C. § 922(a)(1)(A), in that **HARRIS**, not having a federal firearms license, was in the business of dealing firearms to Defendant 2. **HARRIS** transferred multiple firearms with specific discussions that these firearms were being resold and did not possess a license to deal such firearms.

## VI.     PROBABLE CAUSE

15.     Based on my review of Defendant 2's phone, and my own knowledge of this investigation, I am aware of the following:

16.     In early September 2023, I began my review of Defendant 2's cell phone pursuant to the previously mentioned search warrant authorized by United States Magistrate Judge Jacqueline Chooljian in the Central District of California on August 11, 2023.[6]  During my review, I discovered hundreds of

---

[6] When ATF seized this cell-phone pursuant to the search warrant, Defendant 2 confirmed to ATF SA Traverso the phone was his and provided SA Traverso with the passcode to access the phone.

text messages and images concerning the possession, sale, and use of firearms, machineguns, ammunition, and firearms parts and accessories between Defendant 2's phone and Verizon phone number (559) 805-6896, a phone number listed as "Corey" in Defendant 2's phone contacts. After querying commercial databases for (559) 805-6896, reviewing subscriber information provided by Verizon via subpoena, and reviewing the content of the messages, I determined Corey **HARRIS** to be the user of this phone number.[7]

17.    Based on my knowledge of this investigation, I knew Defendant 2 to be prohibited from owning firearms and ammunition due to two prior criminal convictions.[8] I also determined, from the context of Defendant 2's and **HARRIS**'s messages, and my own open-source research, that **HARRIS** was a sworn law enforcement officer in the Eastern District of California during this time.

18.    Based upon Defendant 2's and **HARRIS**'s messages, I believe **HARRIS** transferred at least three firearms (a Glock Model 17C 9mm caliber pistol, bearing serial number LNW340 (the "Glock 17C"), a privately manufactured .223 caliber AR-pistol machinegun, and an unidentified AK-style rifle) to Defendant 2 in 2021 and 2022 in the Eastern District of California.

### A.    March 26, 2021:  HARRIS Transfers Firearm Parts to Defendant 2 and Legal Ownership of Glock 17C to Defendant 2's Wife

19.    In reviewing the messages between Defendant 2 and **HARRIS** on Defendant 2's phone, I saw various conversations showing that **HARRIS** transferred a pistol to Defendant 2 in Visalia, California, on March 26, 2021.

20.    In early 2021, Defendant 2 attempted to arrange to have **HARRIS** transfer the above-described Glock Model 17C pistol (the "Glock 17C") to his now-wife ("Defendant 2's Wife"), for the purpose of transferring it to Defendant 2, a prohibited person.  On January 7, 2021, Defendant 2 asked **HARRIS** when was a "Good day to transfer the 19," to which **HARRIS** replied, "It's a 17."  Based on

---

[7] Commercial databases affiliated the (559) 805-6896 number to **HARRIS**.  Verizon subpoena returns listed Elizabeth **HARRIS** as the subscriber of (559) 805-6896, who I believe to be **HARRIS**'s significant other based on text messages between **HARRIS** and Defendant 2 referring to "Liz" and searches of commercial databases showing **HARRIS** and Elizabeth **HARRIS** residing at the same addresses, and both **HARRIS** and Elizabeth **HARRIS** are listed as owners of 31356 Blair Road, Exeter, California.  **HARRIS** also sent Defendant 2 multiple "selfie" images of himself throughout the messages, matching his DMV photograph.

[8] In Spring 2023, I obtained certified conviction documents relating to Defendant 2's prior prohibitive criminal convictions, including a felony conviction and misdemeanor conviction of domestic violence.

my training and experience, I believe Defendant 2 and **HARRIS** were referring to models of Glock pistols, and **HARRIS** had a Glock Model 17 available for sale. Defendant 2 then asked when they could conduct the transfer of the firearm, and **HARRIS** stated, "Whenever [Defendant 2's Wife] can get out here to do the paper work [. . .]Or whenever I can get out there." Based on my knowledge of this investigation, I know that Defendant 2 and Defendant 2's Wife lived in the Central District of California and **HARRIS** lived in the Eastern District of California at that time.

21.     Also in early 2021, **HARRIS** and Defendant 2 arranged for **HARRIS** to provide firearms parts and accessories to Defendant 2, in addition to the Glock 17C. For example, on January 20, 2021, **HARRIS** discussed having Defendant 2's Wife drive to **HARRIS**'s residence to meet "Liz" who was "At the house so she can get the package forsure forsure." **HARRIS** then confirmed the "package" for Defendant 2 by stating, "20-45 mags 4-9 mags 1 red dot 1 ar drum?" **HARRIS** later stated, "Yea bro Liz is at the house though with the stuff. Tell her [Defendant 2's Wife] to text liz, I'll try to get done so we can do the gun." Based on my knowledge of the investigation, **HARRIS** was stating that he would try to provide both "the gun," meaning the Glock 17C, and "the stuff," meaning other firearms parts and accessories such as various magazines and optical sights, to Defendant 2's Wife through **HARRIS**'s wife "Liz."

22.     On March 20, 2021, Defendant 2 told **HARRIS** he and Defendant 2's wife would be "Out there on Friday. [Defendant 2's Wife] going to take off. Will you be able to meet up? What all do you have for me?" Next, **HARRIS** proceeded to list what was in Defendant 2's "package", stating, "You got (20) 45 sticks $22 each (2) ak 60's 75 each (2) red dots $120 each. And do you still want the 40 drums?" Based on my training and experience, I believe **HARRIS** was referring to various extended magazines for different calibers of ammunition, including .45 caliber and 7.62x39mm caliber ("AK"). After some


EXTENDED MAGAZINES OF VARING CALIBERS AND CAPACITIES

discussion about the prices and resale prices of the firearm magazines and parts, **HARRIS** told Defendant 2, "You'll make your money fast." Following this, **HARRIS** stated, "$1620 is the total for everything" and sent Defendant 2 various images of extended magazines (above).

23.    On March 23, 2021, Defendant 2 told **HARRIS** "We [are] going to Tulare on Friday, what would be a good time to meet up with you?" Based on my training, experience, and my knowledge of the investigation, I believe Defendant 2 was asking **HARRIS** when Defendant 2's Wife could meet with **HARRIS** so that **HARRIS** could complete the required documentation to transfer ownership of the Glock 17C (on paper) to Defendant 2's Wife.[9] **HARRIS** instructed Defendant 2 to "Tell [Defendant 2's Wife] to bring a vehicle registration or bill with her name and current address. She needs her ID, Handgun safety card, bring her guard card too just in case they need more stuff. If she has her birth certificate to bring that just in case." Following this, Defendant 2 messaged **HARRIS**, "Can't wait to pick my stuff up" and **HARRIS** replied, "Me too, [you] got some good stuff."

24.    On March 26, 2021, **HARRIS** messaged Defendant 2 to confirm Defendant 2 and Defendant 2's Wife were still coming to meet **HARRIS** later that day. Defendant 2 stated "[Defendant 2's Wife] is going bro I can't get off. She going to leave here at 11 ish once she gets off. She had to get another fire arm safety card too."[10] **HARRIS** replied, "Ok, and do you want me to give her the [box] of stuff?" Based on my knowledge of this investigation, I believe **HARRIS** was asking Defendant 2 if he should give Defendant 2's Wife a box of extended magazines and firearms parts that Defendant 2 ordered from **HARRIS**. Defendant 2 confirmed that he wanted **HARRIS** to give Defendant 2's Wife the box of firearms parts and accessories.

25.    Next, **HARRIS** provided Defendant 2 with the address of 15071 Avenue 296, Visalia, California 93292, which is the address of Best Jewelry & Loan, a Federal Firearms Licensee ("FFL") in the Eastern District of California. Defendant 2 stated he had $1,200 on him, but **HARRIS** stated the full price of the firearm and box of firearms parts was $1,620 and asked, "How long til you have the rest

---

[9] Based on my knowledge of California's firearms laws, there was likely a waiting period between the date **HARRIS** transferred the Glock 17C to Defendant 2's wife on paper and the date Defendant 2's Wife could possess the firearm.

[10] On March 25, 2021, Defendant 2 messaged **HARRIS** that Defendant 2's Wife had misplaced her California Firearms Safety Certificate.

because I gotta pay for these still." Defendant 2 stated he would have the rest of the money the following week because, "Imma sell a lot of it this weekend[. . .] [Defendant 2's Wife] on her way and will be there by 2." **HARRIS** told Defendant 2 to "Venmo me the rest as soon as you can, these guys hold on to my orders until they get the money. And I have 2 big orders holding with good shit." **HARRIS** then asked, "Do I get 1200 from [Defendant 2's Wife]? [. . .] Yeah bro, more of the 100's & 50', ar mags. Ak drums." Defendant 2 replied, "Yeah [Defendant 2's wife will] give you 1200 cash, I'll Venmo rest to you." A few hours later, **HARRIS** messaged Defendant 2, "Your package is secure [. . .] I got something good for us to smoke when you guys come. I told [Defendant 2's wife] in a couple weeks we will be ready."

26. According to my August 2023, query of California Automated Firearms System ("AFS") records, **HARRIS** transferred ownership of a Glock Model 17C 9mm caliber pistol bearing serial number LNW340 to Defendant 2's Wife through Best Jewelry & Loan (a licensed firearm dealer) on March 26, 2021.[11]

**B.    April 2021:  HARRIS Discusses Transfer of Machinegun Conversion Device to Defendant 2 and Defendant 2 Picks Up Glock 17C**

27. I also found other conversations between **HARRIS** and Defendant 2 on Defendant 2's phone showing that **HARRIS** attempted to transfer a machinegun conversion device[12] to Defendant 2 in April 2021 and other messages confirming that Defendant 2's Wife picked up the pistol sold to Defendant 2 on March 26, 2021.

28. On April 8, 2021, **HARRIS** stated an individual who had two AK-47 style firearms also had a "9mm glock, on an 80%.[13] It was broken and I fixed it for him. He wants to sell it, but its [sic] pricy [sic] because it has something on it." After Defendant 2 asked **HARRIS** what the price of the

---

[11] In mid-January 2024, I recovered the Glock 17C from a neutral third party, C.L., who had been storing the firearm for Defendant 2 since the August 2023 search warrant. C.L. consented to forfeit the Glock 17C (pictured below).

[12] Machinegun conversion devices are parts designed and intended to convert a semiautomatic firearm to fire automatically more than one shot by a single function of the trigger. They are therefore, by themselves, "machineguns" under 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b), and they are illegal to possess under 18 U.S.C. § 922(o)(1).

[13] Based on my training and experience, an "80%" is a slang term that refers to an unfinished frame of a privately manufactured firearm.

COMPLAINT AFFIDAVIT

9

firearm was and what was on it, **HARRIS** replied, "He was talking 8 or 9. It has a button.[14]" Defendant 2 then asked, "Is the button like the last ar[15] I got," to which **HARRIS** replied, "Correct."[16]

29.     Based on my knowledge and experience, I believe **HARRIS** was using "something" and "button" as a code words to describe a machinegun conversion device (commonly known as a "Glock switch") and **HARRIS** was attempting to obtain this firearm for Defendant 2.  **HARRIS** recommended that Defendant 2 test fire the firearm first, and Defendant 2 stated he would test fire it and would "Pick up the 17 tomorrow and test that one too [. . .] We're going to leave here at 2 when [Defendant 2's Wife] gets out of work."  Based on my knowledge of this investigation, I believe Defendant 2 was telling **HARRIS** that, the following day, he would pick up and test fire the Glock 17C that **HARRIS** had transferred (on paper) to Defendant 2's Wife on March 26, 2021.

30.     On April 9, 2021, **HARRIS** told Defendant 2 that the owner of the privately manufactured firearm with the machinegun conversion device did not want to sell the firearm but that **HARRIS** would find Defendant 2 another firearm.  **HARRIS** additionally stated he would "Ask to keep the button. My other buddy wants to see it to make them," likely referring to the machinegun conversion device on the privately manufactured firearm.

31.     On the same day, **HARRIS** messaged Defendant 2 that "[Best Jewelry & Loan] closes at 5, you gotta get there at least 30 mins before to get the gun out."  Defendant 2 stated he and Defendant 2's Wife would be there in time.  **HARRIS** then warned Defendant 2 not to smell like marijuana when they entered the business to retrieve the firearm.

32.     On April 20, 2021, **HARRIS** messaged Defendant 2, "Did [Defendant 2's Wife] pick up

---

[14] Based on my training and experience, I believe "8 or 9" refers to $800 or $900 when referring to the price of a privately made firearm. I believe "button" refers to a machinegun conversion device.

[15] Based on this exchange, I believe Defendant 2 was telling **HARRIS** that he had previously obtained a fully automatic AR-style machinegun, possibly the previously described .223 AR-style pistol machinegun.

[16] On July 28, 2021, Defendant 2 told **HARRIS** his associate was selling a "Fully Glock 19 for 1500" and asked **HARRIS** if he should purchase the firearm.  **HARRIS** advised Defendant 2, "Up to you. If it were an actual glock I'd say yeah. But you know how much it cost to build those, and them buttons arent [sic] rare."  In my training and experience, "fully" is commonly used to describe fully automatic firearms.  Additionally, on August 1, 2021, Defendant 2 told **HARRIS** he wanted a Glock Model 18 pistol, which is a fully automatic machinegun.  **HARRIS** told Defendant 2 you, "Basically have one. The 17c with a button is an 18 [. . .] But forreals, a glock 18 is a 17c with a button."

the glock?"  Based on my knowledge of this investigation, I believe **HARRIS** was asking if Defendant 2's Wife obtained the Glock 17C **HARRIS** transferred (on paper) to Defendant 2's Wife on March 26, 2021.

33.     Based on my training and experience, I know that sworn peace officers such as **HARRIS** are familiar with firearms transactions.  Based that training and experience and on the totality of the conversations described above, I know that **HARRIS** was transferring the Glock 17C to Defendant 2, using his wife as a "straw purchaser", which is a third party who can legally possess firearms who fills out the paperwork for a firearm being sold to a person who cannot legally possess firearms.  I further know that as a sworn peace officer, **HARRIS** would be able to recognize when someone is acting as a straw purchaser and would know when a straw purchaser is being used it is because the final recipient cannot legally possess a firearm or intends to use a firearm for an illegal purpose.



GLOCK 17C
TRANSFERRED FROM
**HARRIS** TO
DEFENDANT 2

C.     <u>**August 2022:  HARRIS Transfers AK-Style Firearm to Defendant 2**</u>

34.     I also found other conversations between **HARRIS** and Defendant 2 on Defendant 2's phone showing that **HARRIS** sold an AK-style firearm to Defendant 2 in August 2022.

35.     On or around August 6, 2022, Defendant 2 and **HARRIS** exchanged text messages suggesting **HARRIS** would travel from the Eastern District of California to meet Defendant 2 in the Central District of California to buy and sell firearms and/or firearms accessories.  **HARRIS** asked Defendant 2, "What am I taking," to which Defendant 2 replied, "The AK mon, I might have someone

wanting the saiga," which, based on my training and experience, referred to an AK-style firearm and an Izmash Saiga-12 AK-style shotgun. **HARRIS** later sent Defendant 2 an image of a Saiga-12 shotgun with

 

two extended magazines and a screenshot of a redacted text message thread with an unknown owner of the Saiga shotgun, which **HARRIS** referred to as "The 12."

36.     Following this, **HARRIS** told Defendant 2, "If you peep wants it, I have to come back with the money today."   Defendant 2 then claimed his associate wanted the AK-rifle, to which **HARRIS** replied, "Oh, I thought you wanted the AK.  The package deal on the ak was for you. I had someone ready to buy it. The ak not the Saiga."  Defendant 2 and **HARRIS** then agreed to this arrangement and made plans to meet in the Central District of California, with Defendant 2 providing **HARRIS** with his address. A short while later, **HARRIS** sent Defendant 2 an image from inside a vehicle driving on a highway.  A few hours after this, **HARRIS** sent Defendant 2 a close-up image of the trigger and frame of a possible Saiga-12 firearm which read, "Made in Russia By Izhmash."

37.     Approximately one week later, Defendant 2 messaged **HARRIS**, "I sold AR mon, you got my AK," to which **HARRIS** replied, "Yuuup."[17]  Defendant 2 then stated he would send the money for the firearm to **HARRIS** using Defendant 2's Wife's Venmo account and stated, "I'll head over next

---

[17] AR and AK are common terms used to refer to types of calibers of semi-automatic rifles and pistols.



AK-STYLE FIREARM FROM
DEFENDANT 2'S RESIDENCE

weekend to pick up AK and AR.”[18]

### D.   October 2022:  Defendant 2 Sells a Machinegun to Defendant 1 who Sells it to an ATF CI

38.   On October 27, 2022, during a controlled purchase of a firearm in the Central District of California, an ATF CI purchased a privately manufactured .223 caliber AR-pistol machinegun from Defendant 1.  According to text messages I discovered on Defendant 2's phone from the same day, Defendant 2 agreed to sell the machinegun to Defendant 1 for approximately $1,250 and allowed Defendant 1 to enter Defendant 2's residence to obtain the machinegun.  Defendant 1 then met with the CI outside of Defendant 2's residence and sold the CI the machinegun (pictured below).[19]

39.   A few hours after the controlled purchase, Defendant 2 sent a text message to **HARRIS**



PRIVATELY MANUFACTURED .223 AR-
PISTOL MACHINEGUN PURCHASED FROM
DEFENDANT 1

---

[18] During the August 2023, search of Defendant 2's residence, ATF recovered an AK-style Zastava N-PAP M70 7.62x39mm caliber rifle bearing serial number N-PAP035707 (which I determined to have been reported stolen by the Hanford Police Department in 2014 after querying the National Crime Information Center (“NCIC”) database).  In early 2024, I obtained the stolen firearm police report from the Hanford Police Department.

[19] ATF officially determined this firearm to be a machinegun in 2023.

stating, "I have cash for that finally, do you want me to put in bank and send it to you." A few hours later, **HARRIS** replied, "Ohh mon."[20]

### E.   **HARRIS Instructs Defendant 2 About Manufacturing Firearms**

40.   I also saw conversations between **HARRIS** and Defendant 2 on Defendant 2's phone showing that **HARRIS** instructed Defendant 2 on how to manufacture firearms and what parts Defendant 2 should purchase to build his own firearms.

41.   In April 2021, **HARRIS** told Defendant 2 to be patient about acquiring privately manufactured pistol frames, stating, "Just be patient, I'll find out another one or we will build" the firearm together. Defendant 2 would often message **HARRIS** about the various frames, barrels, and slides **HARRIS** had for sale and ask **HARRIS** if they were of good quality or how to assemble them.

42.   In May 2021, **HARRIS** told Defendant 2 he needed parts such as a "Slide, slide parts kit, barrel, recoil spring, lower parts kit with trigger" in order to manufacture a firearm. **HARRIS** told Defendant 2 where to find such items online.[21]

43.   Next, Defendant 2 sent **HARRIS** images of a Polymer80 pistol frame with a jig/template in the background, which I know is used to assist in manufacturing the plastic Polymer80 frame into a firearm. Following this, Defendant 2 stated, "I got the one you sent me. I want to grab 3 of these. Are they good [too]?" to which **HARRIS** replied, "Yeah that's what I have, they are the full size." Defendant 2 then stated, "I want to build something cool. Not [too] sure what parts are good," to which **HARRIS** replied, "I'll help you find them."

44.   Following this, Defendant 2 asked **HARRIS** if he had an "FFL" (federal firearms license), to which **HARRIS** replied he did not because there were too many regulations.

45.   In September 2021, Defendant 2 asked **HARRIS** if he could "Take this switch off," to

---

[20] In a series of text messages from July 24, 2021, Defendant 2 sent **HARRIS** two images of the rear half of the machinegun and asked if **HARRIS** could get him a folding stock for the firearm. **HARRIS** stated, "because the that tube is part of the gas/bolt system. You would have to get a piston upper in order to get a folding stock," demonstrating a familiarity of the anatomy of the firearm.

[21] According to Grand Jury subpoena records I received from Kineti-Tech (an FFL in Florida) and eBay, Defendant 2 placed approximately 19 orders for firearms parts and accessories between June 2021 and February 2023 from various parts sellers and FFLs on eBay.

which **HARRIS** replied he could.  Defendant 2 then asked if **HARRIS** could show Defendant 2 how to "Take that pin off and put it on the 17", to which **HARRIS** replied, "Yeah, it's super easy."  Based on my training and experience, I believe **HARRIS** and Defendant 2 were talking about removing a Glock switch machinegun conversion device from a firearm which Defendant 2 possessed and installing it on a Glock Model 17 pistol, likely the Glock 17C **HARRIS** sold to Defendant 2.[22]

46.     On June 6, 2021, after Defendant 2 sent **HARRIS** an image of a pistol slide, **HARRIS** asked if he, "Completed the lower [frame]?"  Defendant 2 replied, "I'm just ordering all parts needed. Was hoping when you get some time you can show me how to build them."  **HARRIS** stated, "Yeah I can help you assemble.  I never done the lower tho, haven't done mine yet.  I'm gonna have my buddy show me, then I can do it."

**F.      HARRIS Sells Additional Firearms Accessories and Ammunition to Defendant 2**

47.     I also found other conversations between **HARRIS** and Defendant 2 on Defendant 2's phone showing that **HARRIS** often sold ammunition to Defendant 2.

48.     On July 23, 2021, Defendant 2 told **HARRIS** he needed ammunition, to which **HARRIS** replied, "I can get ammo, but need $$$ to order it."  After Defendant 2 asked for prices of .223 and 5.56x45mm caliber ammunition, **HARRIS** stated, "[The] way it works, is every week day he emails me a list.  It's different everyday.  So I have to wait til Monday to see it."

49.     On October 20, 2021, Defendant 2 traveled to the Eastern District of California, and **HARRIS** advised Defendant 2 to "Leave the cash with Liz. $950 right?"  Defendant 2 told **HARRIS** he needed five 30-round capacity magazines.  **HARRIS** replied, "You got $650 on you?  Them 556 1000 cases sold for 640 […] I'll sell you one for 600 (that's cost) and 5 30's for 650."  Next, **HARRIS** claimed he sold most of the ammunition to someone else, but told Defendant 2, "Those little boxes [of ammunition] can sell for $15+ a piece, there are 50 in the case, you can make $150 profit on the case.  I'm gonna order more when I get back so if you want some let me know."

_____

[22] During the August 2023 search of Defendant 2's residence, ATF recovered a Glock Model 19 9mm caliber pistol bearing serial number BUPD386, with a machinegun conversion device installed on it.  When ATF observed the Glock 17C during the search of Defendant 2's residence, it did not have a machinegun conversion device installed on it.

50.     On March 16, 2022, after **HARRIS** sent Defendant 2 an image of an Uzi-type firearm,[23] **HARRIS** provided Defendant 2 with a list of ammunition he had, stating, "Ok there is a case of 40 cal. $250 for 500, or $480 for 1000.  Then I have a case of 9mm. $220 for 500, or $400 for 1000.  All good quality brass ammo Winchester 223 1000 rnds $550 (cheapest in a long time)."  **HARRIS** then offered prices of extended magazines, drum-style magazines, and ammunition, stating, "2x$130 100 drum 2x$80 50 drums 5x$10 30 rnders 1 40cal case $480 1 9mm case $400 1 223 case $550."

51.     On March 29, 2022, Defendant 2 told **HARRIS**, "I need 2k of 9, 40, 223 mon."  Based on my training and experience, Defendant 2 was referring to 9mm, .40 caliber, and .223 caliber ammunition. **HARRIS** then asked Defendant 2 if he needed 2,000 rounds of each caliber and stated, "I have ammo on order.  Should come next week."  **HARRIS** then clarified, "These 223 and 40 come in battle packs.  223 in 200 rnd battle packs, and 40 in 300rnd battle packs."  Following this, **HARRIS** sent multiple images of "battle packs" of ammunition (below, left), both .223 and .40 caliber.  During the August 2023 search warrant at Defendant 2's residence, ATF recovered an unopened "battle pack" of PMC .40 caliber ammunition (below, right).

 

52.     On March 30, 2022, **HARRIS** told Defendant 2, "I'll be able to get you the 2k 9mm.  But not 223 or 40.  Only a 1k each.  I didn't have enough $."

53.     On December 9, 2022, **HARRIS** told Defendant 2 he had an "AK Package: 1500 case of 556: 500 Ar mags $10 each (3): 30 300rnd 40 cal: $150.  I also have 2 polymer 80s if you want them."

---

[23] **HARRIS** would later send this same image of an Uzi to Defendant 2 on July 15, 2022, and stated, "Uzi, it's 5k. My price is 4600."

Based on my knowledge and experience, I believe **HARRIS** was listing the quantities and calibers of ammunition that he had available for sale, in addition to two Polymer80, privately manufactured pistols. Defendant 2 stated he would purchase the Polymer80 pistols from **HARRIS**. **HARRIS** then stated he purchased the 5.56 caliber ammunition for $499.99 and would "Take a loss and do it for 470." According to their messages, Defendant 2 and **HARRIS** appeared to agree to meet the following day.

54.    In addition to the above sales, **HARRIS** advised Defendant 2 where he could obtain ammunition without a background check. On May 19, 2021, Defendant 2 asked **HARRIS**, "What's the name of the spot you were telling me to get the ammo in Nevada. The one where I could go in with cash." **HARRIS** replied, "Ventura Munitions." **HARRIS** further stated, "Even if they ask [to check identification] it's just to check your age."

55.    **HARRIS** and Defendant 2 continued to discuss the sale of firearms, firearms accessories, and ammunition continuously through 2021, 2022, and 2023. The last messages consistent with firearms trafficking occurred two days before Defendant 2's arrest on August 13, 2023. These most recent messages between **HARRIS** and Defendant 2 discussed the caliber, quantity and price of ammunition. Ammunition cannot legally be sold in California without a license, and Defendant 2, as a felon, cannot legally possess ammunition.

### G.    HARRIS Sells Additional Firearms Accessories to Defendant 2

56.    In addition to firearms and ammunition, I found conversations between **HARRIS** and Defendant 2 on Defendant 2's phone showing that **HARRIS** sold Defendant 2 numerous extended magazines for various calibers of pistols and rifles, and firearms lights and sights between 2021 and 2023 which were similar to items ATF recovered from Defendant 2's residence in August 2023.

57.    **HARRIS** would often list out the items in Defendant 2's "package" along with the quantities and prices of each. For example, on July 24, 2021, **HARRIS** messaged Defendant 2:

58.    "Ok this is what I can allocate for you:

a)    (4) 100's $145 = $725

b)    (5) 50's $100 = $500

c)    (5) 30's $13 = $65

d)      (2) Red Dots $140 = $280

e)      (1) red dot $120

f)      (3) pistol lights $90 = $270"

59.      Based on my training and experience, I believe **HARRIS** was referring to the ammunition capacity of various extended magazines when using the terms "100's","50's", and "30's."

60.      **HARRIS** would also send Defendant 2 images of sealed packages of extended magazines and firearms accessories and ask Defendant 2 what he wanted.  Defendant 2 would then send some of these images to various customers.  For example, in February 2022, Defendant 2 sent an image depicting Sig Sauer extended pistol magazines to one of his associates.   The image Defendant 2 sent was a screenshot of an Instagram Story from **HARRIS**'s Instagram account "Lion.tactical" that appeared to advertise "Sig P320 21rnd mags" via Instagram Story.



### H.      HARRIS Knew that Defendant 2 was Reselling the Items

61.      Based on my review of Defendant 2's and **HARRIS**' messages, I learned that **HARRIS** knew Defendant 2 would be reselling these items to Defendant 2's associates, often suggesting what prices Defendant 2 should charge for the magazines.

62.      For example, on April 6, 2021, Defendant 2 messaged **HARRIS**, "These guys kinda don't like the 50s for the 40 [. . .] So far sold 2, they want the sticks."  Based on my training and experience, I believe Defendant 2 was telling **HARRIS** that his customers purchasing 50-round capacity, .40 caliber

magazines did not like them and preferred "stick" magazines, which are long, rectangular magazines.

63.    Additionally, on July 15, 2021, **HARRIS** messaged Defendant 2, "I give you the stuff cheap and your ass still shorts me lol that last big package you got, I only make 50 bucks off."  After Defendant 2 told **HARRIS**, "The employee is always right," **HARRIS** told Defendant 2 he was a "Vendor not employee."  Defendant 2 claimed he was "Top sales employee mon [. . .] Oh I'm a vendor now." **HARRIS** then stated, "You [Defendant 2] run your own business, I just be the supplier."

64.    On December 9, 2022, **HARRIS** messaged Defendant 2, "AK package: 1500 case of 556: 500 Ar mags $10 each(3): 30 300rnd 40 cal: $150.  I also have 2 polymer 80's if you want them.  Full size, one black, one tan."  Defendant 2 stated he would "Take the polymers," but, "Might have to pass on the 556 case right now bro.  I have everything else though."  **HARRIS** then stated he purchased the 1,000 rounds of 5.56x45mm ammunition for $499.99 and claimed, "I'll take a loss and do it for 470."  **HARRIS** and Defendant 2 then agreed to meet within the next few days, but I was unable to determine if they conducted their transaction.

I.    **HARRIS Warned Defendant 2 About Defendant 2's Firearms and Firearms Accessories Customers**

65.    I found other conversations between **HARRIS** and Defendant 2 on Defendant 2's phone showing that **HARRIS** was concerned his activities with Defendant 2 could be discovered.

66.    On April 25, 2021, after discussing extended magazines and Polymer80 pistol frames, **HARRIS** messaged Defendant 2, "Hey that box I gave you, make sure you take the shipping label off so it cant [sic] get tracked."  In August 2023, during the service of a search warrant at Defendant 2's residence, ATF recovered a cardboard box containing approximately 800 rounds of 5.56x45mm caliber ammunition.  Later, upon inspecting the box, I discovered a FedEx shipping label affixed to the exterior with a sender of "Orion Wholesale" and an addressee of "LION DEFENSE GROUP" and the address, "3013 S Maple St Visalia CA 93292."  However, the date of shipment appeared to be September 2021(pictured below).[24]

_____

[24] In April 2024, I recieved shipping records from FedEx Ground related to HARRIS' residence at 31356 Blair Road Exeter, CA 93221.  Upon reviewing those records, I discovered that between March 2022, and May 2023, "Orion Arms Corp" and "Orion Wholesale" sent approximately 100 shipments to 31356 Blair Road which were addressed to "Lion Defense Group."  According to open-source research,

FEDEX PACKAGE CONTAINING 800 ROUNDS
OF AMMUNITION WITH **HARRIS**' PREVIOUS
ADDRESS.  FOUND IN DEFENDANT 2'S
RESIDENCE

67.     Based on my query of commercial databases, I knew **HARRIS** to be affiliated with the 3013 S. Maple Street address since at least 2018 as a likely resident.[25]  The query revealed that **HARRIS** sold the residence at 3013 S. Maple Street in October 2021.  In addition, according to AFS records, **HARRIS** used the 3013 S. Maple Street address as his address of record for dozens of firearms transactions (sales, transfers, and purchases) since 2019.  According to the same AFS records, **HARRIS** also used the 31356 Blair Road, Exeter, CA as an address of record for three firearms transactions on November 16, 2022, one firearm sale on December 8, 2023, and one firearm sale on January 12, 2024.  In addition, a query of commercial databases showed **HARRIS** and his wife purchased the residence at the 31356 Blair Road, Exeter, CA in September 2021.

68.     On May 28, 2021, **HARRIS** warned Defendant 2, "Don't tell [an associate, "C.L."] shit [. . .] I don't trust that fool and he hit me up asking me to build him [an] AR."  Defendant 2 stated C.L. was at Defendant 2's residence looking at Defendant 2's AR-style firearm and wanted to buy it.  Defendant 2 stated, "[C.L.] asked me who hooked it up how it is I told him you did [. . .] He asked me to see if you can

Orion Wholesale is a FFL in Indiana that distributes firearms, ammunition, and firearms accessories.

[25] Multiple commercial databases linked **HARRIS** to this address between 2018 and 2021 using credit reports.

make one." **HARRIS** later stated, "Just letting you know I don't wanna fuck with that fool.  I could see him ratting."

69.    On June 4, 2021, **HARRIS** and Defendant 2 were discussing the extended magazines **HARRIS** had in Defendant 2's next "package" when **HARRIS** stated, "Sell your 100's.  Just keep 50's and 30's.  30's are the most reliable."  Based on my training and experience, I believe **HARRIS** was referring to the capacities of various extended magazines.  After Defendant 2 stated, "They want more ak 30 and AR drums," **HARRIS** replied, "Please make sure they are going to legit peeps.  I was a little bugged out when you told me where a couple of those sticks went.  I don't want that karma."[26]  Defendant 2 then reassured **HARRIS** his customers were "Peeps who own businesses" and **HARRIS** replied, "Ok Coo, yeah bro keep it to peeps like that, they will be repeat customers for your and they will tell their peeps, and you'll be selling out left and right."

### J.    HARRIS' Background

70.    Based on my review of the messages between **HARRIS** and Defendant 2 and my own research, I determined the following information about **HARRIS**:

71.    **HARRIS** moved to 31356 Blair Road, Exeter, CA 93221 in approximately mid-November 2021, which is located in the Eastern District of California.  Prior to this, **HARRIS** likely resided in Visalia, California.  I know this because I located a series of messages on Defendant 2's phone from November 2021 in which **HARRIS** confirmed with Defendant 2 that he had moved into a new residence. In addition, on or around December 31, 2021, **HARRIS** sent Defendant 2 a text message with the address of 31356 Blair Road, Exeter, CA, as **HARRIS** and Defendant 2 planned to meet up for New Year's Eve.

72.    I also determined, based on open-source research and conversations with other law enforcement officers, **HARRIS** was a police officer with the Visalia Police Department and a Detective with the California Department of Cannabis Control during the timeframe of the alleged criminal activity. I also learned that **HARRIS** was a police officer with the San Diego Police Department sometime before

---

[26] Based on my training and experience, extended pistol caliber magazines are often referred to as "sticks" for their long narrow appearance.

2016.  As a police officer, **HARRIS** can purchase firearms[27] and large capacity or extended magazines[28] that would otherwise be unlawful to possess, purchase, or sell in California by the public.  Nearly all the magazines discussed in the preceding paragraphs that **HARRIS** transferred to Defendant 2 are considered large capacity magazines under California law.  In addition, according to AFS records, between 2016 and 2023, **HARRIS** sold or otherwise transferred at least 20 "off-roster" firearms in private party transfers.

73.    In January 2024, I viewed **HARRIS**'s Instagram account "Beaker.jones" using an undercover Instagram account and observed Instagram stories and posts of various tactical knives displayed alongside firearms.  The account "Beaker.jones" had the tagline: "(Previously Lion Tactical) Knife Collector Precious Metal Stacker Pew Pew Lover."

74.    Below are images I captured upon viewing the "beaker.jones" Instagram account profile page and an Instagram Story labeled "Lion Tactical" from February 6, 2024.  The profile tagline was altered since my previous viewing in January 2024 to read, "Knife Raffles."

 

**K.    HARRIS Does Not Have a Federal Firearms License Nor Does He Have Any**

---

[27] The California Department of Justice (CalDOJ) maintains a public "Roster of Certified Handguns," which lists handguns that have met certain CalDOJ standards and can be purchased, sold, manufactured, or transferred in California.  Handguns that do not appear on this list are referred to as "off-roster" firearms, and cannot be manufactured, purchased, or sold in California.  However, law enforcement officers are exempt from these requirements and may purchase "off-roster" firearms and transfer them in private party transactions.

[28] California Penal Code 32310 prohibits possessing, selling, purchasing, giving away, importing, transporting, or manufacturing magazines capable of holding more than 10 rounds of ammunition, though law enforcement officers are exempt from this statute.

**Firearms Registered in the National Firearms Registration and Transfer Record**

75.     A person must have an FFL to engage in the business of manufacturing and dealing in firearms.  Under the National Firearms Act, certain firearms and other items must also be registered with ATF in the National Firearms Registration and Transfer Record ("NFRTR").  As defined in 26 U.S.C. § 5845, firearms and items requiring registration include short-barreled rifles, machineguns, firearm silencers, and other special categories of firearms.

76.     In early January 2024, ATF Industry Operations Investigators queried the Federal Licensing System database, which is used to track the issuance of FFLs, and the NFRTR to determine if **HARRIS** had ever had an FFL or had ever registered any items in the NFRTR.  According to these queries, **HARRIS** does not have an FFL and did not have any items registered in the NFRTR.[29]

**L.      HARRIS Purchased Approximately 78 Firearms Since 2013 and Sold Approximately 43 Firearms According to AFS**

77.     Additionally, in September 2023, November 2023, and April 2024, I requested California DOJ Bureau of Firearms to query the California AFS to determine the number of firearms **HARRIS** bought, sold, and/or transferred over approximately the last 10 years, since 2013.[30]  According to AFS records, **HARRIS** purchased approximately 78 firearms and sold or transferred approximately 43 firearms during this time.  Of the 43 firearms **HARRIS** sold or transferred, approximately 32 firearms were sold or transferred within two years of **HARRIS** purchasing them, 22 of which were sold or transferred within one year of purchase.  In addition, between 2020 and 2022, **HARRIS** purchased approximately 31 firearms and sold 21 firearms.  In an approximate four-month span in 2020, **HARRIS** purchased 10 firearms.  In an approximate seven-month span in 2021, **HARRIS** sold eight firearms.  Based on this data and **HARRIS**'s previously documented conversations with Defendant 2, I believe **HARRIS** was engaging in the business of dealing firearms without a license.

**M.     HARRIS is a Career Law Enforcement Officer and Firearms Instructor with**

---

[29] In January 2024, I contacted California DOJ Special Agent Ronny Castillo and requested he conduct a query to determine if **HARRIS** was licensed in the State of California to sell ammunition. Special Agent Castillo informed me **HARRIS** did not appear in their database of licensed ammunition dealers.

[30] This total does not include private party transfers of firearms that were not conducted through an FFL or otherwise reported to California DOJ.

**Extensive Knowledge of Firearms and Rules and Regulations**

78.     Based on my knowledge of this investigation, I know **HARRIS** has been employed as a law enforcement officer with various state and local departments since at least 2015.  In addition, based on my conversations with other law enforcement officers, I know **HARRIS** has been a firearms instructor for the California Department of Cannabis Control for several months.  Based on my training and experience, firearms instructors have extensive working knowledge about firearms, including machineguns, privately made firearms, and firearms parts and accessories.  I also know that **HARRIS** claimed to Defendant 2 to have gone to an "HK armorer school in Georgia" in October 2021.[31]

79.     I also know that **HARRIS** has legally purchased approximately 78 firearms documented with California Dealer Record of Sales ("DROS") forms in AFS and sold/transferred approximately 42 firearms to non-prohibited persons through FFLs since 2013.  I also know it is likely that **HARRIS** has access to, or is familiar with, law enforcement databases, such as NCIC and AFS, where law enforcement officers can query the status of firearms to determine if they have been reported stolen.

80.     In addition, the duration and breadth of Defendant 2's relationship with **HARRIS**, in addition to **HARRIS** own actions and statements, I believe **HARRIS** knew Defendant 2 was prohibited from possessing firearms.  I believe this to be true because:

81.     **HARRIS** transferred the Glock 17C to Defendant 2's Wife through an FFL but coordinated the details of the transfer with Defendant 2, even while Defendant 2 made statements about possessing the firearm himself.  However, I believe **HARRIS** transferred the privately manufactured .223 AR-pistol machinegun,  and the Zastava rifle directly to Defendant 2 without the use of an FFL even though California law requires all private-party transfers of firearms to be facilitated through an FFL.

82.     **HARRIS** purchased approximately 78 firearms from non-prohibited persons and sold/transferred approximately 43 firearms to non-prohibited persons since 2013 through FFLs, according to AFS.

83.     **HARRIS** told Defendant 2 he could purchase ammunition at Ventura Munitions in Nevada

---

[31] Based on my training and experience, I believe **HARRIS** was using "HK" to refer to Heckler & Koch, and firearms manufacturer.  According to Heckler & Koch's website, they offer an "Armorer's Course" at their facilities in Columbus, Georgia.

where they wouldn't check Defendant 2's identification.  I know that in California, FFLs and licensed ammunition dealers are required to conduct background checks on prospective ammunition customers.

**N.      HARRIS' Firearms Trafficking Affected Interstate Commerce**

84.      Based on my training and experience, I know **HARRIS**' firearms trafficking between 2021 and 2023 affected interstate commerce because it involved firearms that were manufactured outside of California as well as the importation of parts in order to manufacture firearms from outside of California.

85.      I have received specialized training in the manufacture, origin, and identification of firearms and have been qualified to conduct interstate nexus examinations of firearms and ammunition since August 2022.

86.      As discussed above, **HARRIS** transferred a Glock Model 17C 9mm caliber pistol bearing serial number LNW340 to Defendant 2 via a straw purchase through his wife in March/April 2021. Based on my training and experience, I know that this pistol was manufactured outside of California and therefor traveled in and affected interstate commerce.

87.      As discussed above, **HARRIS** transferred a Zastava N-PAP M70 AK-style 7.62x39mm caliber rifle bearing serial number N-PAP035707 to Defendant 2 in August 2022. Based on my training and experience, I know that this rifle was manufactured outside of California and therefor traveled in and affected interstate commerce.

88.      As discussed above, I believe **HARRIS** assisted Defendant 2, his co-conspirator, in the manufacture of machineguns and other firearms using parts sourced from other states. This includes, based on Defendant 2 and **HARRIS'** conversation, assisting in the installation of a machinegun conversion device on a Glock Model 19 9mm caliber pistol bearing serial number BUPD386 in or around January or February 2023, which I know based on my training and experience was manufactured outside the State of California and therefor traveled in and affected interstate commerce.

89.      As discussed above **HARRIS** also counseled his co-conspirator Defendant 2 on where to obtain firearms parts. Defendant 2 ordered parts from E-Bay on at least 19 occasions, including a pistol slide from Florida.

**O.      HARRIS Knew that Possession of the Firearms He Transferred to Defendant 2**

**Would Constitute a Felony**

90.     As discussed above, **HARRIS** transferred firearms to Defendant 2 on approximately the following dates:

a)      August 2022 –an AK-style rifle believed to be Zastava N-PAP M70 AK-style 7.62x39mm caliber rifle (S/N N-PAP035707) (the "Zastava Rifle")

b)      Spring 2021 – privately manufactured .223 caliber AR-type pistol machinegun bearing no manufacturer's markings (the "AR machinegun")

c)      March-April 2021 – Glock 17C 9mm caliber pistol (S/N LNW340) (the "Glock 17C")

91.     **HARRIS** has reasonable cause to believe that Defendant 2 was a felon, because as a peace officer and firearms instructor **HARRIS** was able to recognize the straw purchase of the Glock 17C and discussed with Defendant 2 how to purchase ammunition out of state from vendors that would not perform a background check.  Based on my training and experience, a person with **HARRIS**'s background would not instruct Defendant 2 to do these things unless he believed that Defendant 2 was prohibited from possessing firearms and ammunition.

92.     **HARRIS** is a California peace officer and firearms instructor as discussed above. Based on my training and experience in law enforcement and firearms, I know that peace officers are instructed as part of their training that felons are unable to possess firearms and possession of a firearm by a felon is a felony offense.

93.     As discussed above, I believe **HARRIS** transferred a machinegun, which is a weapon regulated by the National Firearms Act, to Defendant 2 on the following date:

94.     Spring 2021 – privately manufactured .223 caliber AR-pistol bearing no manufacturer's markings (the "AR machinegun").

95.     This transfer was not recorded as required by law in the National Firearms Registration and Transfer Record. Possession of such an unregistered firearm is a felony in violation of 26 U.S.C. § 5861(b), (c) and (d). Possession of a machinegun in California is additionally a felony in violation in California Pen. C. § 32625.

96.     Additionally, as discussed above, **HARRIS** and Defendant 2 exchanged messages and pictures discussing the transfer and manufacture of machineguns that were not recovered.  Possession of

such firearms is a felony under 26 U.S.C. § 5861(d) as discussed above and is evidence of their conspiracy to traffic firearms in violation of 18 U.S.C. § 933(a)(3).

97.    **HARRIS** is a California peace officer and firearms instructor as discussed above. Based on my training and experience in law enforcement and firearms, I know that peace officers are instructed as part of their training that possession of a machinegun is a felony.

### VII.    CONCLUSION & REQUEST FOR SEALING

98.    I believe the above facts set forth probable cause to believe that Corey Scott **HARRIS** violated Title 18, United States Code, Section 922(a)(1)(A), engaging in the business of dealing in firearms without a license, and Title 18 United States Code, Section 933(a)(3), conspiracy to commit firearms trafficking. I request that an arrest warrant be issued for **HARRIS** for this violation based on the conduct described above.

99.     Because this complaint and arrest warrant concerns an active investigation and premature notice of the warrant may alert targets and permit them to flee, destroy evidence, or tamper with witnesses, I request this complaint, affidavit, and arrest warrant be sealed by order of this court until such time as the warrant has been served and the defendant arrested.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

*Chris Stantzos*

Christopher Stantzos
Special Agent, Bureau of Alcohol, Tobacco,
Firearms & Explosives

This Affidavit was submitted to me by email/pdf and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1, and 41(d)(3) on ___April 15, 2024___.

*Sheila K. Oberto*

Hon. SHEILA K. OBERTO
United States Magistrate Judge

COMPLAINT AFFIDAVIT

27

Reviewed as to form.

 /s/ Robert L. Veneman-Hughes

ROBERT L. VENEMAN-HUGHES
Assistant U.S. Attorney